**IN THE COURT OF APPEALS OF IOWA**

No. 22-1096
Filed October 5, 2022

**IN THE INTEREST OF K.S.,**
**Minor Child,**

**J.F., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Story County, Stephen A. Owen, District Associate Judge.

A mother appeals the termination of her parental rights to her eight-year-old daughter. **AFFIRMED.**

Katherine Flickinger of Hastings, Gartin & Boettger, LLP, Ames, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Shannon M. Leighty, Nevada, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Tabor and Chicchelly, JJ.

**TABOR, Judge.**

"She refuses to acknowledge or address her substance abuse for any substantial and lasting period of time." This finding sums up the order terminating Jessica's parental rights to K.S., her daughter who is now eight years old.[1] Jessica appeals the termination order, trying to preserve her parental rights. She challenges the statutory grounds, asserts the State did not make reasonable efforts to reunify her and K.S., and claims that because of their close parent-child relationship, termination was not in her daughter's best interests and would be detrimental. After reviewing the full record, we reach the same conclusions as the juvenile court and thus affirm.[2]

## I.  Facts and Prior Proceedings

This family and the Iowa Department of Health and Human Services[3] have been in frequent contact since 2008.[4] Drugs were found in K.S.'s system at birth in 2014. DHHS reports involving K.S. would continue in 2015, 2017, 2019, and 2021, all stemming from Jessica's substance abuse and lack of appropriate supervision.

---

[1] The father's rights were terminated in an earlier order.

[2] We review termination decisions de novo. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). "We are not bound by the factual findings of the juvenile court, though we give them respectful consideration, particularly with respect to credibility determinations." *Id.* The State must present clear and convincing evidence to support the grounds for termination. *Id.* That level of proof means we harbor no "serious or substantial doubts" about the correctness of the legal conclusions drawn from the evidence. *Id.* (citations omitted).

[3] After a recent merger with the Department of Public Health, the department is now called the Iowa Department of Health and Human Services. So we will use the acronym DHHS.

[4] The 2008 report relates to one of Jessica's other children.

The DHHS first removed K.S. when she was one year old and returned her to Jessica in May 2016.  When K.S. was around three, DHHS again removed her from her home, before returning her over two years later in November 2019.  In January 2021, six-year-old K.S. called 911 after Jessica experienced a medical emergency.  While providing treatment, the hospital screened Jessica for drugs.  She tested positive for methamphetamine, amphetamine, and marijuana.  She admitted to using methamphetamine while caring for K.S. but blamed the relapse on the chance discovery of the drug and pipe in the pocket of some old clothes.  Her substance-abuse evaluation found this to be "very unbelievable" given her history of using methamphetamine since she was a teenager.  The evaluator diagnosed her with methamphetamine abuse disorder, severe, in early remission; cannabis use disorder, severe, uncomplicated; and alcohol abuse disorder, mild.  The DHHS removed K.S. from her home for the third time.

In early 2021, K.S. experienced several different out-of-home placements under a safety plan.  When K.S. briefly returned to Jessica's care, she told her therapist that she did not feel safe in her mother's home.  Due to Jessica's continued drug use and mental-health issues, the court approved a DHHS request to remove K.S. for a fourth time.  To her credit, Jessica was consistent in visiting K.S. during this time.  But Jessica was prone to discussing inappropriate topics with her child.  And at one visit, case supervisors called police because Jessica refused to let service providers take K.S. from her.

In April 2021, the juvenile court adjudicated K.S. as a child in need of assistance (CINA).  The court told Jessica she "should work diligently to address her mental health and substance abuse with the goal of achieving stability and

sobriety." The DHHS recommended Jessica continue participation in substance-abuse and mental-health treatment and random drug screenings.

Yet, she continued to test positive for methamphetamine and other drugs until September 2021. Then she stopped complying with drug testing and revoked her consent for medical providers to share information with the DHHS. She blamed the DHHS for using inaccurate drug testing methods and not giving her the option to choose how she was tested.[5] Without these releases or tests, the DHHS had no way of knowing whether Jessica was addressing her substance abuse and mental health. She refused to talk with case workers and referred questions to her attorney. Jessica continued to seek drug and mental health treatment but was discharged at points for lack of attendance or requiring a higher level of care. One evaluator predicted that Jessica would continue to relapse "until she gets the proper balance of structure and supports in her life." After her last unsuccessful discharge in December 2021, the service provider invited her to return for treatment in ninety days; she did not return.

As before, Jessica continued to consistently visit K.S. But their time together never progressed past formal supervision and weekly phone calls because Jessica persisted in broaching inappropriate topics with her child.

In March 2022, the juvenile court directed the State to petition to terminate Jessica's parental rights. Seeing the writing on the wall, Jessica obtained a new substance evaluation in June 2022, two days before the termination trial. It

---

[5] The DHHS used sweat patches to test for drug use. Jessica admitted trying to tamper with the patches to obtain proof of their inaccuracies. She presented no evidence of such proof.

recommended outpatient treatment. At the trial, she attributed her lack of progress to not knowing what was expected of her or how to access services. She blamed her previous attorney for being ineffective in relaying information to her.[6] But she also testified that her lack of cooperation was meant as a form of retaliation: "When somebody pushes you to do something, you don't want to do it and you retaliate, so I did it on my own."

The juvenile court doubted Jessica's asserted ignorance, noting that the DHHS had been involved with this family "for most of the last five years." The court pointed to Jessica's failure to communicate with case workers "to avoid accountability and responsibility for not engaging in mental health and substance abuse services that in all likelihood would have resulted in her reunification with her daughter." The court terminated her parental rights to K.S. under Iowa Code section 232.116(1) (2022), paragraphs (e), (f), and (*l*). She now appeals.

## II.    Analysis

We generally analyze termination cases by asking three questions. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). First, did the State prove a ground for termination under section 232.116(1)? *Id.* at 472–73. Second, if so, is the termination in the child's best interests measured by the criteria in section 232.116(2)? *Id.* And third, is there a countervailing factor in section 232.116(3) that would weigh against termination? *Id.*

---

[6] Jessica presented no evidence of her prior attorney's incompetence nor did she call that attorney as a witness at the proceeding.

## A. Statutory Grounds for the Termination

Jessica first contends the district court erred in terminating her parental rights under paragraphs (e), (f) and (*l*) of section 232.116(1). When the juvenile court bases its termination decision on more than one paragraph, we may affirm on any ground supported by clear and convincing evidence. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). Today we focus on paragraph (f). To satisfy that ground, the record must show:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.16(1)(f).

Jessica only contests the fourth element. In contending K.S. could come home, Jessica highlights her own testimony and that of Stephanie Starrett, the Family Centered Services (FCS) worker who met with her weekly and supervised some visits with K.S. Since Starrett testified that she was "not sure" whether it would be safe for K.S. to come home, Jessica claims there was insufficient evidence that returning K.S. to her would be harmful. As further proof, Jessica points to her stable housing, employment, and her assertion that she no longer uses methamphetamine or other substances.

But Starrett's testimony is not as Jessica represents it. The FCS worker hesitated to agree that K.S. could be returned home "because it's hard to verify

any identifiable progress" by Jessica. The mother's revocation of medical provider releases, rejection of testing, and refusal to communicate with case workers left the juvenile court in the dark. It was not able to confirm that she was embracing the necessary mental-health and substance-abuse services. Plus, Jessica offered many excuses for her failure to engage with DHHS and admitted her actions were somewhat retaliatory. Weighing all this information, the court doubted Jessica's credibility. The court explained that when she was "confronted with facts showing her lack of responsibility, failure to respond to services and general uncooperativeness, [Jessica] seemed to shrivel into a shell of denial." The court concluded that her substance-abuse and mental-health issues were ongoing and unaddressed.

Paying due deference to the juvenile court's credibility determinations, we likewise conclude that K.S. could not be safely returned to Jessica's custody at the time of the termination trial.[7] The record showed that she did not embrace services and support necessary to address her substance-abuse and mental-health issues. She tested positive for methamphetamine up until she started blaming the DHHS

---

[7] Our case law offers two formulations for what it means when a child "cannot be returned" to parental custody as provided in section 232.102 (discussing transfer of a child's legal custody if staying in the home would be "contrary to the welfare of the child"). Many cases cite *In re M.M.*, 483 N.W.2d 812, 815 (Iowa 1992) which quotes section 232.102(4)(a)(2)—then numbered section 232.102(5)(b)—for the proposition that custody should be transferred only if the court finds "the child cannot be protected from some harm which would justify adjudication of the child as a child in need of assistance and an adequate placement is available." *See, e.g.*, *In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016). But more recent cases observe that our supreme court often describes that element simply as the inability to "safely return" children to their parents' care. *See, e.g.*, *In re T.W.*, No. 20-145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases). Under either articulation, we find the State met its burden of proof.

and stopped testing. *See In re C.F.*, No. 20-1067, 2020 WL 6482073, at *1 (Iowa Ct. App. Nov. 4, 2020) ("We presume these missed drug tests would have resulted in positive tests." (citation omitted)). And after her last failed attempt at treatment, care providers invited her to return in three months, but instead she blamed the care providers and refused.

True, Jessica claimed to be sober and going to Narcotics Anonymous and Alcoholics Anonymous. While positive steps, those measures do not erase her history of methamphetamine use, her rejection of treatment and testing, and her refusal to give the DHHS information on her progress. Considering that evasive conduct, we fear future harm to K.S. is likely if returned home. *See In re J.P.*, No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) (concluding because the parents' "relationship with methamphetamine" was not over, child could not be safely returned to their care). Termination was proper under paragraph (f).

## B. Reasonable Efforts

Jessica next asserts that the DHHS did not make reasonable efforts to reunify K.S. with her.[8] *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("[T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination. Instead, [it] . . . impacts the [State's] burden of proving the elements of termination which require reunification efforts."). The DHHS must "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." *Id.*

---

[8] Under this same issue heading, Jessica mentions best interests. *See* Iowa Code § 232.116(2). But she makes no substantive arguments under that provision. Her passing reference is not enough to merit our consideration.

Jessica concentrates on the DHHS refusal to increase her interactions with K.S. or change the supervision level despite her being consistent in visiting her daughter and "showing signs of improvement." She also blames the DHHS for allowing K.S.'s foster family to stop her daily calls with her daughter. And she notes that the DHHS never reached out to her attorneys after she refused to cooperate with testing and revoked her releases for treatment information. Finally, she believes the DHHS should have done more to find mental-health services for her when the initial providers fell through.

In response, the State contends Jessica did not preserve error on her reasonable-efforts claim because she waited too long to raise her concerns with the juvenile court. When gauging reasonable efforts, a parent's request for more or different help is key. *See In re L.M.*, 904 N.W.2d 835, 839–40 (Iowa 2017) ("[P]arents have a responsibility to object when they claim the nature or extent of services is inadequate.").

Despite the State's contention, Jessica did bring up additional visitation at the October 2021 permanency hearing, well before the June 2022 termination trial. So, for the purposes of this appeal, we will assume that she preserved error on her request for expanded visitation.[9] In rejecting Jessica's request for additional visitation, the juvenile court noted in its permanency order that the DHHS was providing twice weekly supervised sessions lasting ninety minutes each. Because she tested positive for methamphetamine just one month earlier, the court found

---

[9] But she did not preserve error on her grievances concerning communication with the DHHS, its failure to address the foster family's decision to end her daily calls with K.S., and its lack of help in finding new mental-health services. *Id.* So we cannot address those claims.

that the existing visitation schedule and restrictions were appropriate. We agree with the juvenile court that those services were reasonable given Jessica's ongoing substance abuse.

### C. Closeness of Parent-Child Relationship

Jessica next argues that termination was improper because of her "strong bond" with K.S. Jessica bears the burden under section 232.116(3)(c). *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). That provision allows a court to preserve parental rights if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). Jessica points to Starrett's testimony that she and her daughter have a very caring relationship.

But the guardian ad litem contests the strength of the mother-child bond. K.S. has, at times, expressed a preference to stay with her foster family. Similarly, K.S. told her therapist that she did not feel safe in her mother's home. And the DHHS supervisor testified that while K.S. and Jessica had a loving relationship, it was not entirely healthy: "it's almost like [K.S.] has put herself in a caretaking role and feels that she has to be there to take care of her mom."

When assessing that evidence, we focus on whether K.S. will be "disadvantaged by termination" and whether that disadvantage outweighs Jessica's inability to meet her needs. *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). While severing her legal relationship with Jessica will likely be hard on K.S., our concerns for her safety and well-being in Jessica's care outweigh that detriment. K.S. has experienced the trauma of being removed from Jessica's care

four times. Severing the legal tie to her mother will enable K.S. to obtain more structure and settle into a stable childhood.

**AFFIRMED.**